UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

STEPHEN J.[1],          )
         )
       Plaintiff,      )
         )
      v.        )    No. 1:21-cv-00301-DLP-JPH
         )
KILOLO KIJAKAZI,      )
         )
       Defendant.    )

## ORDER

Plaintiff Stephen J. requests judicial review of the denial by the Commissioner of the Social Security Administration ("Commissioner") of his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d). For the reasons set forth below, the Court hereby **REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further consideration.

## I. PROCEDURAL HISTORY

On October 11, 2018, Stephen filed his application for Title XVI SSI benefits. (Dkt. 14-5 at 2-7, R. 139-44). Stephen alleged disability resulting from traumatic brain injury, short-term memory loss, post-traumatic stress disorder, anxiety, and left knee torn meniscus. (Dkt. 14-6 at 3, R. 155). The Social Security Administration

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Order.

("SSA") denied Stephen's claim initially on January 31, 2019, (Dkt. 14-3 at 2-16, R. 50-64; Dkt. 14-4 at 2-5, R. 80-83), and on reconsideration on April 11, 2019, (Dkt. 14-3 at 17-31, R. 65-79).

Stephen filed a written request for a hearing, and on June 4, 2020, Administrative Law Judge ("ALJ") Jody Hilger Odell conducted a hearing, where Stephen and vocational expert Amy Foster appeared by phone. (Dkt. 14-4 at 18-20, R. 96-98; Dkt. 14-2 at 31-50, R. 30-49). On July 13, 2020, ALJ Odell issued an unfavorable decision finding that Stephen was not disabled. (Dkt. 14-2 at 16-26, R. 15-25). Stephen appealed the ALJ's decision, and, on December 14, 2020, the Appeals Council denied Stephen's request for review, making the ALJ's decision final. (Dkt. 14-2 at 2-4, R. 1-3). Stephen now seeks judicial review of the ALJ's decision denying benefits pursuant to 42 U.S.C. § 1383(c)(3).

## II.   STANDARD OF REVIEW

Under the Act, a claimant may be entitled SSI only after he establishes that he is disabled. To prove disability, a claimant must show he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that he is not able to perform the work he previously engaged in and, based on his age, education, and work experience, he cannot engage in any other

kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A).

The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 416.920(a).[2] The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then he must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R. § 416.920 (a negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled).

---

[2] The Code of Federal Regulations contains separate, parallel sections pertaining to disability benefits under the different titles of the Social Security Act, such as the one cited here that is applicable to supplemental security income benefits. Often, as is the case here, the parallel section pertaining to the other type of benefits—in this case disability insurance benefits—is verbatim and makes no substantive legal distinction based on the benefit type. *See* 20 C.F.R. § 404.1520(a).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform his own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 416.920(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant – in light of his age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a

4

conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Stephen is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to h[er] conclusion," *Clifford*, 227 F.3d at 872, articulating a minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The

ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

### III.   BACKGROUND

#### A. Factual Background

Stephen was forty-five years old as of the date of his application. (Dkt. 14-2 at 24, R. 23). He obtained his GED in 1991. (Dkt. 14-6 at 4, R. 156). He has relevant past work history as a warehouse worker and truck driver. (Id.).

#### B. ALJ Decision

In determining whether Stephen qualified for benefits under the Act, the ALJ employed the five-step sequential evaluation process set forth in 20 C.F.R. § 416.920(a) and concluded that Stephen was not disabled. (Dkt. 14-2 at 16-26, R. 15-25). At Step One, the ALJ found that Stephen had not engaged in substantial gainful activity since his October 11, 2018 application date.[3] (Id. at 18, R. 17).

At Step Two, the ALJ found that Stephen suffered from severe medically determinable impairments of dysfunction of the left knee (status post medial meniscus tear with arthroscopy and partial medial meniscectomy); anxiety; and alcohol abuse disorder. (Id.). At Step Three, the ALJ found that Stephen's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. § 416.920(d); 416.925; and 416.926. (Id. at 18, R. 17). In

---

[3] SSI is not compensable before the application date. 20 C.F.R. § 416.335.

reaching this determination, the ALJ considered Listing 1.02 (major dysfunction of a joint) and Listing 12.06 (anxiety and obsessive-compulsive disorders). (Dkt. 14-2 at 18-21, R. 17-20).

As to the "paragraph B" criteria, the ALJ found that Stephen had a moderate limitation in interacting with others, and mild limitations in understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Id. at 19-21, R. 18-20). The ALJ also found the "paragraph C" criteria not satisfied. (Id. at 21, R. 20).

After Step Three but before Step Four, the ALJ found that Stephen had the residual functional capacity ("RFC") to perform light work, as defined in 20 C.F.R. § 416.967(b), with the following limitations: frequently climb stairs and ramps; frequently balance, stoop, kneel, crouch, and crawl; occasionally climb ladders, ropes, or scaffolds; avoid concentrated exposure to moving machinery and unprotected heights; can perform simple or detailed (but not complex) tasks; no more than superficial interactions with coworkers and supervisors; and no more than occasional interactions with the public. (Dkt. 14-2 at 21-24, R. 20-23).

At Step Four, the ALJ concluded that Stephen has no past relevant work. (Dkt. 14-2 at 24, R. 23). At Step Five, relying on the vocational expert's testimony, the ALJ determined that, considering Stephen's age, education, work experience, and residual functional capacity, other jobs exist in significant numbers in the national economy that Stephen can perform. (Dkt. 14-2 at 24-25, R. 23-24). The ALJ thus concluded that Stephen was not disabled. (Id. at 25, R. 24).

## IV.   ANALYSIS

Stephen challenges the ALJ's decision on two grounds. First, Stephen

contends that the ALJ conducted a flawed credibility assessment. (Dkt. 16 at 16-

21).[4] Second, Stephen argues that the ALJ's RFC assessment is flawed because the

ALJ failed to adequately assess the impact of his psychological symptoms on his

daily functioning. (Id. at 22-27). The Court will consider these arguments in turn.

### A.  Subjective Symptom Analysis

Plaintiff argues that the ALJ erred when considering his subjective

symptoms under Social Security Ruling 16-3p. (Dkt. 16 at 16-21). "In evaluating a

claimant's credibility, the ALJ must comply with SSR 16-3p and articulate the

reasons for the credibility determination." *Karen A. R. v. Saul*, No. 1:18-cv-2024-

DLP-SEB, 2019 WL 3369283, at *5 (S.D. Ind. July 26, 2019). SSR 16-3p describes a

two-step process for evaluating a claimant's subjective symptoms.[5] First, the ALJ

must determine whether the claimant has a medically determinable impairment

that could reasonably be expected to produce the individual's alleged symptoms.

SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017). Second, the ALJ must evaluate

the intensity and persistence of a claimant's symptoms, such as pain, and determine

---

[4] The paginated numbers provided at the bottom of Plaintiff's Opening Brief do not correspond with the paginated numbers of the brief on the Docket. The Undersigned has decided to cite to the page numbers as they appear in the header of the document throughout this Order.

[5] SSR 16-3p became effective on March 28, 2016, (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *13, replacing SSR 96-7p, and requires an ALJ to assess a claimant's subjective symptoms rather than assessing his "credibility." By eliminating the term "credibility," the SSA makes clear that the "subjective symptom evaluation is not an examination of an individual's character." *See* SSR 16-3p, 2016 WL 1119029 at *1. The Seventh Circuit has explained that the "change in wording is meant to clarify that administrative law judges are not in the business of impeaching a claimant's character." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016).

the extent to which they limit his ability to perform work-related activities. *Id.* at *3-4.

At step two of the Rule 16-3 analysis, the ALJ considers the claimant's subjective symptom allegations in light of the claimant's daily activities; the location, duration, frequency, and intensity of pain and limiting effects of other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; treatment other than medication for relief of pain; and other measures taken to relieve pain. 20 C.F.R. § 416.929(c)(3). The ruling also explains that "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." SSR 16-3p, 2017 WL 5180304, at *9.

A court will overturn an ALJ's evaluation of a claimant's subjective symptom allegations only if it is "patently wrong." *Burmester*, 920 F.3d at 510 (internal quotation marks and citation omitted). To satisfy this standard, the ALJ must justify her subjective symptom evaluation with "specific reasons supported by the record," *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013), and build an "accurate and logical bridge between the evidence and conclusion." *Villano*, 556 F.3d at 562. An ALJ's evaluation is "patently wrong" and subject to remand when the ALJ's finding lacks any explanation or support. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th

Cir. 2014); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008); *Cassandra S. v. Berryhill*, No. 18-00328, 2019 WL 1055097, at *5 (S.D. Ind. Mar. 6, 2019).

Although the Court will defer to an ALJ's subjective symptom finding that is not patently wrong, the ALJ must still adequately explain her subjective symptom evaluation "by discussing specific reasons supported by the record." *Pepper*, 712 F.3d at 367. Without this discussion, the Court is unable to determine whether the ALJ reached her decision in a rational manner, logically based on her specific findings and the evidence in the record. *Murphy*, 759 F.3d at 816 (internal quotations omitted); *see also* SSR 16-3p, at *9.

During his June 4, 2020 disability hearing, Stephen testified that he rarely leaves his home due to anxiety, and does not drive due to post-traumatic stress resulting from a motor vehicle accident in which he suffered a brain injury. (Dkt. 14-2 at 35-38, R. 34-37). Stephen reported that he has tried a variety of different medications for his mental health; however, they have either increased his anxiety or caused excessive sleepiness. (Id. at 39-40, R. 38-39). Stephen also stated that he has panic attacks when he leaves the house, but is not nervous or anxious around the people he lives with because there are not many of them and he has known them since before his accident. (Id. at 41-42, R. 40-41). Stephen testified that he uses sticky notes to remind himself of things. (Id. at 43, R. 42). Stephen declared that he still has trouble with his left knee. (Id. at 36, R. 35). Stephen also admitted to abusing alcohol and testified that he continues to consume alcohol on a weekly basis. (Id. at 44-45, R. 43-44).

After considering Stephen's hearing testimony regarding his PTSD, anxiety, panic attacks, memory problems, alcohol history and use, left knee issues, and medication history, the ALJ concluded that Stephen's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical and other evidence in the record. (Dkt. 14-2 at 22, R. 21). In reaching this conclusion, the ALJ stated:

> The record indicates that the claimant was involved in a motorcycle crash on August 27, 2011. He sustained a scalp laceration and he was momentarily unconscious. However, by the time he reached the hospital, Glasgow Coma Score was 15 Computerized tomography revealed a subarachnoid hemorrhage. (Ex. 3F, pages 21-26). The recent treatment notes indicate a "history of a traumatic brain injury" (Ex. 12F, page 31). However, the mental status do not establish the requisite signs of decline in cognitive functioning needed to establish the diagnosis as a medically determinable impairment.

> The evidence in record does establish the existence of an anxiety-related disorder. However, the objective findings do not indicate that the condition is as severe as the claimant alleges. The notes from the claimant's primary care physician indicate that the claimant first presented with complaints of anxiety on September 5, 2018. At that time, the claimant acknowledged a history of heavy alcohol intake starting in the morning, which he claimed was an effort to self-medicate for pain and anxiety. The physician reported that the claimant appeared anxious and he had a labile affect. However, his affect was not blunt and not inappropriate. His speech was not rapid and/or pressured, not delayed and not slurred. He was not aggressive, not hyperactive, not slowed and not combative. Thought content was not paranoid and not delusional. He did not express impulsivity or inappropriate judgment. He expressed suicidal ideation. (Ex. 4F, page 17). However, the physician did not indicate that the claimant required hospitalization.

> The consultative psychologist reported that the results of the mental status exam did not reveal any significant problems with abstracting ability, general knowledge, or judgment. It suggested anxiety, but this only mildly interfered with his concentration, mental math calculating, and memory. Accompanying memory testing was in the low average range, even though the claimant did not experience anxiety in the course

of the evaluation. The psychologist concluded that his memory was a minor secondary problem, and drinking was an uncertain intertwining factor (Ex. 10F).

The claimant did not seek active mental health treatment until May of 2019. At the time of the initial evaluation, the attending psychiatrist indicated that the claimant denied suicidal ideation, mania, and hallucinations. The psychiatrist observed that the claimant appeared to exhibit some degree of blocking and circumstantiality. However, the mental status examination was otherwise essentially normal. The claimant's grooming was within normal limits. He was generally relaxed, calm, and cooperative. The psychiatrist initially prescribed one set of psychotropic medications (Zoloft and trazodone). During the ensuing months, the medications were changed because the claimant would stop taking the ones prescribed because he was either sleeping too much or not enough. He expressed feelings of anxiety and depression with passive suicidal ideation. However, he promised not to act on these thoughts. Moreover, the mental status examinations consistently indicated that the claimant's overall appearance includes appropriate dress and good hygiene. He is relaxed, calm, engaged and cooperative, albeit with some irritability and anxious. Thought content is appropriate, although he continues to be circumstantial (Ex. 12F). He has not required psychiatric hospitalization or increased outpatient treatment. In other words, the evidence indicates general stability.

(Dkt. 14-2 at 22-23, R. 21-22).

Stephen contends that the ALJ's subjective symptom analysis is flawed because the ALJ perfunctorily concluded that Stephen's statements about the intensity, persistence, and limiting effects of his symptoms were inconsistent with "the claimant's testimony, subjective complaints and limitations [which] are disproportional to the diagnostic studies, clinical exam findings and treatment record." (Dkt. 16 at 17). The Court has yet to find this allegedly conclusory statement in the ALJ's decision. Instead, the ALJ properly relied on the objective medical evidence of the Plaintiff's impairments, his daily activities, self-reported symptoms, hearing testimony, consultative psychologist's opinion, treatment, and

medication use to assess Stephen's subjective symptoms. (*See* Dkt. 14-2 at 22-23, R. 21-22).

In reviewing the ALJ's evaluation, Stephen accuses the ALJ of improperly relying on the claimant's lack of inpatient hospitalization to discredit the severity of his symptoms. (Dkt. 16 at 17-18). Specifically, Stephen argues that the ALJ erred by referencing Stephen's lack of "inpatient hospitalization" without explaining why this form of treatment would be necessary to support his subjective complaints. (Dkt. 16 at 17-18). The Commissioner contends that the ALJ's consideration of Plaintiff's level of treatment, including his lack of hospitalization, was a valid consideration. (Dkt. 17 at 10-11). The Commissioner also asserts that Plaintiff has failed to demonstrate how the ALJ's reference to Plaintiff's lack of hospitalization constitutes reversible error. (Id. at 11). The Court agrees.

As the Commissioner correctly notes, treatment, including hospitalizations, is one of the factors an ALJ may consider in evaluating the intensity, persistence, and limiting effects of a claimant's symptoms. 20 C.F.R. § 416.929(c)(3); SSR 16-3p, 2017 WL 5180304, at *8. In considering Stephen's subjective symptoms, the ALJ twice noted that Plaintiff did not require hospitalization related to his anxiety. (Dkt. 14-2 at 23, R. 22). The ALJ then explained that the lack of psychiatric hospitalization or increased outpatient treatment is evidence of general stability of Plaintiff's mental health treatment. (Dkt. 14-2 at 23, R. 22). *See Elizabeth A. D. v. Saul*, No. 19 C 6024, 2021 WL 148831, at *13 (N.D. Ill. Jan. 15, 2021) (noting that while the absence of hospitalizations does not necessarily mean that a claimant is able to

work; the ALJ properly considered that the lack of psychiatric hospitalizations reflected substantial improvement in claimant's psychiatric symptoms). This evaluation was proper. Because the ALJ did not discount Stephen's subjective reports of his symptoms solely because of a lack of psychiatric hospitalization in the record, the Court does not find remand appropriate on this issue.

Next, Stephen takes issue with the ALJ's failure to explain the impact his medication side effects had on his ability to function in the workplace fulltime. (Dkt. 16 at 18-19). In response, the Commissioner maintains that any insufficiency associated with the ALJ's consideration of Stephen's medication side effects is harmless error. (Dkt. 17 at 11-12). First, the Commissioner argues that the claimant has failed to produce any evidence that his medication side effects rendered him unable to sustain full-time work. (Id. at 11). The Commissioner also maintains that the objective medical evidence fails to support Stephen's subjective claims concerning the side effects of his medications restricting his ability to work. (Id. at 12). Lastly, the Commissioner seems to suggest that the Court should discount Stephen's hearing testimony regarding his new medication which causes him to sleep excessively during the day because the more recent medical records demonstrate that Stephen had been "placed back on [medications that] had not caused the sleeping side effects that other medications had. (Id. at 12).

As part of her subjective symptom assessment, the ALJ found that the evidence in the record established that Stephen suffered from an anxiety-related disorder. (Dkt. 14-2 at 23, R. 22). The ALJ concluded, however, that the objective

findings did not indicate the condition was as severe as Stephen alleged. (Dkt. 14-2 at 23, R. 22). In reaching this determination, the ALJ considered the September 5, 2018 treatment notes of Stephen's Plaintiff's primary care physician, Dr. Louis Winternheimer. During that visit, Dr. Winternheimer noted that Stephen appeared anxious and had a labile but not blunted or inappropriate affect; exhibited speech that was not rapid, pressured, delayed, or slurred; and displayed thought content that was not paranoid or delusional. In the examination report, Dr. Winternheimer noted that Stephen did not express inappropriate judgment and that he was not aggressive, hyperactive, slowed, combative, or impulsive. (Dkt. 14-2 at 23, R. 22; Dkt. 14-7 at 100-02, R. 318-20).

Next, the ALJ considered the consultative psychological examiner, Dr. Robert Blake's, report which noted that Stephen showed no significant problems with abstracting ability, general knowledge, or judgment. Based on his examination, on January 22, 2019, Dr. Blake opined that Plaintiff's anxiety only mildly interfered with his concentration, mental math calculating, and memory. (Dkt. 14-2 at 23, R. 22; Dkt. 14-8 at 96-99, R. 570-73).

The ALJ also considered Plaintiff's mental health treatment which began in May 2019 with Nurse Practitioner Andrew Slaton. (Dkt. 14-2 at 23, R. 22). When discussing Stephen's treatment with Mr. Slaton, the ALJ recognized that the claimant's mental status examinations since 2019 consistently found Stephen appropriately dressed and exercising good hygiene. (Dkt. 14-2 at 23, R. 22). Mr. Slaton regularly found Stephen was relaxed, calm, engaged, and cooperative, albeit

with some irritability and anxiousness. (Id.). The ALJ also cited Mr. Slaton's mental status examinations which regularly reflected that Stephen's thought content appropriate. (Id.). Over the course of his treatment of Stephen, however, Mr. Slaton changed the Plaintiff's medications several times because of various side effects including sleep issues. (Dkt. 14-2 at 23, R. 22; Dkt. 14-8 at 126-57, R. 600-31).

A review of the medical records shows that between May 2019, when Plaintiff began receiving psychological treatment, and his June 2020 disability hearing, Plaintiff had tried no fewer than seventeen medications to address his medication side effects which included erectile dysfunction, weight loss, dizziness, and sleep issues. (*See* Dkt.14-8 at 129-30, R. 603-04; Dkt. 14-2 at 39-40, R. 38-39). When Stephen began seeing Mr. Slaton, he reported that he was currently taking Remeron, hydroxyzine, and a third unknown medication, however, none of the medications allegedly helped with his mood and only improved his sleep by one hour per night. Mr. Slaton advised Stephen to stop the medications and he started Stephen on Trazadone and Zoloft. (Dkt. 14-8 at 150, 152-57, R. 624, 627-31).

Mr. Slaton's records indicate that on June 19, 2018, Stephen reported that he was stopping Trazadone and Zoloft because they were not helpful and made him sleep too much. (Dkt. 14-8 at 150, R. 624). In response, Mr. Slaton started Stephen on Cymbalta. (Id. at 152, R. 626). The following week, on June 27, 2019, Stephen left a voicemail with Mr. Slaton complaining that the Cymbalta made his anxiety twice as bad and that it worsened his panic attacks. (Dkt. 14-8 at 146, R. 620). Mr.

Slaton returned Stephen's phone call and instructed the claimant to start taking Effexor. (Id.).

Mr. Slaton's records note that during Stephen's July 18, 2019 visit, Plaintiff reported that the Effexor was not helpful and that it made him dizzy, so he stopped taking it. Plaintiff also reported trying Trazadone again but stopped because it was making him sleep too much. (Id.). In an effort to address the medication side effects, Mr. Slaton prescribed Trintellix and prazosin. (Id. at 148, R. 622).

When Stephen returned the following month, on August 29, 2019, he reported that the Trintellix had made him angrier, so he stopped taking it two weeks prior. Stephen also reported that he was not taking the prazosin and had been sleeping fairly well without it. (Id. at 142, R. 616). Mr. Slaton started Stephen on Viibryd. (Id.). On October 8, 2019, Stephen called Mr. Slaton and reported that he had stopped taking the Viibryd because it was altering his taste and causing him to lose weight. In response, Mr. Slaton prescribed Pristiq. (Dkt. 14-8 at 138, R. 612).

A few weeks later, on October 21, 2019, Mr. Slaton started Stephen on Fetzima because the Pristiq had caused the Plaintiff to sleep fourteen hours a day. During the appointment, Mr. Slaton also discussed switching Stephen back to the Paxil if the Fetzima caused additional side effects or was ineffective. Mr. Slaton opined that the Paxil, even though it caused erectile dysfunction, was the most helpful antidepressant medication Stephen had taken previously. (Id. at 133, 137-40, R. 607, 611-14). Agreeing with the treatment plan, the Plaintiff was started on Paxil CR in November 2019. (Id. at 133, R. 607).

Stephen treated again with Mr. Slaton on January 31, 2020 and April 14, 2020. (Dkt. 14-8 at 127-30, 132-36, R. 601-04, 606-10). Mr. Slaton wrote that at the January 31, 2020 appointment, Stephen reported that the Paxil CR had helped with his anxiety, but he was experiencing dizzy spells and was unsure if it was a medication side effect. (Id. at 132-36, R. 606-10). Plaintiff reported only sleeping 4-4.5 hours each night and having issues with his appetite. (Id.). Mr. Slaton continued Stephen on the Paxil CR and restarted the prazosin. Stephen was also started on Wellbutrin XL. (Id.).

On March 17, 2020, Plaintiff left a voicemail with Mr. Slaton reporting that he had stopped taking the Wellbutrin XL because it caused him to sleep 16 hours. Stephen also reported that the prazosin made him hyperactive. (Dkt. 14-8 at 128, R. 602). Approximately two weeks later, on March 30, 2020, Stephen left another voicemail with Mr. Slaton indicating that the Buspar medication, which was prescribed after the Wellbutrin XL, caused him to sleep 17 hours. Based on Stephen's responses to other antidepressants and Genesight results, Mr. Slaton added Strattera to Stephen's prescription regime. (Id.).

On April 14, 2020, Stephen reported to Mr. Slaton that the Strattera made him more irritable and angrier, so he stopped taking it. Stephen also reported that his anxiety and depression was still severe. Mr. Slaton's treatment plan advised Stephen to continue the Paxil CR, start Abilify, and restart psychotherapy. (Id. at 127-30, R. 601-04). At the disability hearing in June 2020, Stephen testified that his

psychotropic medications had increased his anxiety and caused him to have excessive sleepiness. (Dkt. 14-2 at 22, R. 21; *see also* Dkt. 14-2 at 39-40, R. 38-39).

When taken together, the Plaintiff presented sufficient evidence to the ALJ, both in the medical records and in his testimony, that would support his claims of medication side effects including excessive sleepiness, dizziness, increased anxiety, and sleep deprivation, all of which could potentially result in Plaintiff needing additional time off-task or absences from work. An ALJ is required to consider medications that a physician prescribes to treat a claimant's symptoms as well as any side effects those medications produce. SSR 16-3p, 2017 WL 5180304, at *8; *Jayson J. v. Saul*, 2020 WL 597657, at *17 (N.D. Ind. Feb. 7, 2020).

As Stephen recognizes, the ALJ acknowledged his subjective allegations and noted that Stephen's medications had been changed multiple times because the claimant would stop taking them when he was either sleeping too much or not enough. (Dkt. 14-2 at 23, R. 22). Recognizing that the ALJ may well have decided that no RFC limitations were warranted based on Stephen's medication side effects, she was required to say so. The ALJ pointed to no objective evidence that demonstrated that Stephen's sleep issues had been resolved nor did she address Stephen's testimony that his medications were continuing to cause him to sleep excessively. By failing to evaluate Stephen's statements regarding his medication side effects, the Court is unable to determine from the decision why the ALJ determined that a specific work-related functional limitation to address the medication side effects was not necessary in the RFC. *See* SSR 96-8p.  Without any

such analysis in the opinion, the Court is prevented from engaging in a meaningful review, and this issue warrants remand.

Contrary to the Commissioner's assertion, the ALJ's failure to explain the impact of the medication side effects on Stephen's ability to function in the workplace was not harmless error. *See, e.g.*, *Jayson J. v. Saul*, 2020 WL 597657, at *17 (N.D. Ind. Feb. 7, 2020); *Christine F. v. Saul*, No. 2:19cv359, 2020 WL 1673033, at *12-13 (N.D. Ind. Apr. 6, 2020). Relying on treatment notes from January 31, 2020, the Commissioner seems to suggest that Stephen's struggles with excessive sleepiness was resolved when placed back on Paxil. (Dkt. 17 at 12). This is not born out by the record. Moreover, this is not a reason proffered by the ALJ for failing to include a limitation, and such post-hoc rationalization is impermissible. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014); *Phillips v. Astrue*, 413 F. App'x 878, 883 (7th Cir. 2010); *Villano v. Astrue*, No. 2:07 CV 187, 2009 WL 1803131, at *3 (N.D. Ind. June 23, 2009).

As the Court noted above, for several months following this January appointment, Stephen underwent numerous medication trials to manage the fatigue and drowsiness side effects caused by his prescriptions. While the ALJ acknowledged Stephen's subjective complaints that his medications were causing him sleep issues, a review of the record demonstrates that the ALJ's analysis of the support for Stephen's reported limitation is insufficient. Under Social Security Ruling 16-3, an ALJ "must explain why a reported limitation is or is not consistent with the evidence in the record." *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir.

2018). In doing so, the ALJ "must confront evidence that supports a finding of [disability]...and then explain why it was rejected." *Id.* Stephen claimed that he was sleeping 17 hours per day, and Mr. Slaton's treatment records demonstrate that Stephen's medications were changed numerous times to address various medication side effects, including his sleep issues. Defendant maintains that Stephen has failed to cite to a medical record that establishes that his ability to work was limited by his medication side effects. It is reasonable to assume a person having only 7 waking hours, not accounting for the need to commute to and from work, would be limited in his ability to sustain a job. Further, if Plaintiff is sleeping too little, medication side effects of lethargy, drowsiness, and fatigue may cause Plaintiff to be off task an excessive amount of time. This is important because the vocational expert testified that being off-task 15% or more of the time, excluding breaks and lunches, would be work preclusive. (Dkt. 14-2 at 48, R. 47). Given that the ALJ discounted Plaintiff's sleep issues limitation, the ALJ did not include this in Plaintiff's time off task. Adding any additional time for napping or resting could push Plaintiff over the 15% tolerance for time off task. *See e.g., Lanigan v. Berryhill*, 865 F.3d 558, 563-564 (7th Cir. 2017) (finding remand necessary when the ALJ failed to account for and discuss limitations that could make the claimant be off task more than 10% of the workday). Therefore, because the ALJ failed to build a logical bridge from the evidence to her conclusion that Plaintiff's statements concerning the intensity of his symptoms are not entirely consistent with the medical evidence, the Court finds remand is required. The Court remands the

decision so that the ALJ may more fully analyze the Plaintiff's medication side effects, ensure the VE is appraised fully of Stephen's limitations, and to provide an explanation for including or not including certain limitations in the RFC.

### B. Residual Functional Capacity

Stephen next asserts that the ALJ failed to account for his severe limitations with agoraphobia and panic attacks in the mental RFC. (Dkt. 16 at 22-23, 25-26). Stephen also maintains that the ALJ ignored his issues with self-injury and controlling his emotions. (Id. at 22, 24). In response, the Commissioner argues that the ALJ's RFC assessment appropriately accommodates Plaintiff's mental impairments. (Dkt. 17 at 13-15). The Commissioner contends that the ALJ *did* consider Plaintiff's subjective reports of panic attacks, agoraphobia, and mood instability but found them "largely undermined by the objective evidence and Plaintiff's own reports" about his daily activities. (Id. at 15). The Commissioner also contends that Plaintiff is impermissibly asking the Court to reweigh the evidence. (Id.).

The Regulations and Seventh Circuit caselaw makes clear that an ALJ's RFC assessment must incorporate all of a claimant's functional limitations supported by the medical record. *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) ("When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe

impairment."); *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). *See also* SSR 96-8p; 20 C.F.R. § 416.945(a).

Here, the ALJ determined that Stephen had the mental residual functional capacity to perform simple or detailed (but not complex tasks) that involve no more than superficial interactions with coworkers and supervisors and no more than occasional interactions with the public. (Dkt. 14-2 at 21, R. 20). In considering the ALJ's mental RFC assessment, the Court's review is not limited to the analysis provided under the RFC heading; rather, the Court considers the opinion as a whole. *See Antonakis v. Colvin*, No. 14-C-1021, 2016 WL 1175128, at *4 (E.D. Wis. Mar. 25, 2016) ("The ALJ's decision must be read as a whole; an ALJ need not repeat his discussion of medical evidence in each section of the decision where it may be relevant") (citing *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015)).

When considering the entire opinion, it is clear that the ALJ *did* consider Stephen's agoraphobia and issues controlling his emotions in reaching her RFC determination. Specifically, the ALJ acknowledged that in 2019, the psychological consultative examiner, Dr. Robert R. Blake, opined that Stephen had untreated agoraphobia. (Dkt. 14-2 at 20, R. 19; Dkt. 14-8 at 96-101, R. 570-75). Dr. Blake noted, however, that Plaintiff was able to live with a female roommate and was in frequent contact with his child and friends. (Id.). The ALJ also cited to medical records demonstrating that Stephen was generally relaxed, calm, cooperative, and not aggressive or combative. (Dkt. 14-2 at 21, 23, R. 20, 22; Dkt. 14-7 at 101, R. 319; Dkt. 14-8 at 135, 139, 143, 147, 151, 155, R. 609, 613, 617, 621, 625, 629). Stephen's

contentions regarding his agoraphobia and emotional instability essentially amount to a request for the Court to reweigh the evidence, and that is not the role of the Court on review. *See Clifford*, 227 F.3d at 869.

With regards to Stephen's panic attacks, the ALJ acknowledged that they are associated with Plaintiff's engagement with people. (Dkt. 14-2 at 22, R. 21). The ALJ also noted the medical records found Stephen to be generally relaxed, calm, and cooperative. (Dkt. 14-2 at 23, R. 22; Dkt. 14-8 at 126-57, R. 600-31). To address Plaintiff's social limitations, the ALJ restricted Stephen to work involving no more than superficial interactions with coworkers and supervisors and no more than occasional interactions with the public. (Dkt. 14-2 at 21, R. 20). This limitation is supported by consultative examiner Dr. Blake's findings that Plaintiff's anxiety impacts his social interactions but is not debilitating and that Plaintiff does not generally experience anxiety in one-on-one situations. (Dkt. 14-2 at 24, R. 23; Dkt. 14-8 at 96-99, R. 570-73). Moreover, Stephen has failed to provide any explanation of what further limitations should have been included in the RFC to accommodate his panic attacks. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) ("It is unclear what kinds of work restrictions might address Jozefyk's limitations ... because he hypothesizes none."); *Davis v. Berryhill*, 723 F. App'x 351, 356 (7th Cir. 2018) (plaintiff who argued that ALJ should have considered her fibromyalgia symptoms but failed to identify what additional limitations should have been included in the RFC waived challenge and did not identify a reversible error); *Zeatlow v. Berryhill*, No. 18-cv-570-jdp, 2019 WL 494625, at *2 (W.D. Wis. Feb. 8,

2019) (finding that plaintiff was not entitled to relief where she did not identify any limitations supported by the record that were missing from the RFC).

As noted above, however, the ALJ erred in failing to properly address the side effects of Stephen's psychotropic medications in her ruling, and its impact on the RFC. In this case, Stephen has undergone a significant amount of medication trials, and continues to experience various side effects. An evaluation of medication side effects and any impact on Stephen's RFC would have been appropriate in this case, and the ALJ erred by failing to make such an evaluation. Thus, this case must be remanded.

## V.   CONCLUSION

For the reasons detailed herein, the Court **REVERSES** the ALJ's decision denying the Plaintiff benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C. § 405(g) (sentence four). Final judgment will issue accordingly.

So ORDERED.

Date: 8/25/2022

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

25